UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| GARY WAXMAN and LEONARD HAMMERSCHLAG, Individually and On Behalf of All Others Similarly Situated, | No. 16-cv-1899 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CLIFFS NATURAL RESOURCES INC., | |
| Defendant. | |

Plaintiffs Gary Waxman, and Leonard Hammerschlag (together, "**Plaintiffs**"), individually and on behalf of all others similarly situated, by their undersigned counsel, allege the following upon personal knowledge as to their own acts, and upon information and belief based upon the investigation conducted by counsel as to all other matters.

## I.    INTRODUCTION AND NATURE OF THE ACTION

1.    This is a class action against Cliffs Natural Resources Inc. ("**Cliffs**" or the "**Defendant**") brought by Plaintiffs in their individual capacities and on behalf of all persons who beneficially held Cliffs' (i) 5.90% Senior Notes due 2020 (CUSIP 18683KAA9) (the "**5.90% Notes**"); and (ii) 6.25% Senior Notes due 2040 (CUSIP 18683KAC5) (the "**6.25% Notes**," and with the 5.90% Notes, the "**Class Notes**") from February 29, 2016 to the present.[1] The Class Notes were issued pursuant to a March 17, 2010 Indenture (the "**Base Indenture**," a copy of which is attached as Exhibit A hereto) and the Supplemental Indentures, as defined herein (collectively with the Base Indenture, the "**Indentures**"), each between the Defendant and

---

[1] As defined below, the Class excludes holders of Class Notes who are Qualified Institutional Buyers within the meaning of Rule 144A of the Securities Act ("**QIBs**").

U.S. Bank National Association ("**U.S. Bank**"), as trustee. The Class Notes were upon issuance, and are today, registered securities under the Securities Act of 1933 (the "**Securities Act**"). The Class Notes are senior unsecured obligations of Cliffs, which rank equally in right of payment with all of the Defendant's existing and future senior unsecured indebtedness.

2. Like many other mining and natural resources companies, Cliffs has faced severe challenges due to falling commodity prices, putting pressure on Cliffs' ability to repay its debt obligations. Cliffs attempted to alleviate its debt situation when, on January 27, 2016, it announced a proposed private debt exchange (the "**Exchange Offer**") whereby it would exchange and replace certain Class Notes as well as certain 3.95% Notes, 4.80% Notes, 4.875% Notes, and 7.75% 2L Notes, as defined herein, for newly-issued 8.00% 1.5 Lien Senior Secured Notes due 2020 (the "**8.00% 1.5L Notes**"). The Exchange Offer was consummated on February 29, 2016. More specifically, $512.1 million in aggregate principal amount of the aforementioned notes was exchanged in the Exchange Offer for $219 million of 8.00% 1.5L Notes. While approximately $783.6 million aggregate principal amount of Class Notes was outstanding prior to the Exchange Offer, approximately $259.5 million aggregate principal amount of Class Notes were tendered in the Exchange Offer. Thus, approximately $524.1 million in principal amount of Class Notes were not tendered in the Exchange Offer.

3. Even though the Class Notes were registered securities under the Securities Act, the Defendant made the Exchange Offer under exemptions to the Securities Act. As such, the only holders of Class Notes who were eligible to participate in the Exchange Offer were QIBs within the meaning of Rule 144A of the Securities Act and non-U.S. persons within the meaning of Rule 902(k) of Regulation S of the Securities Act ("**non-U.S. persons**"). To be a QIB, an entity must, generally, own and invest, on a discretionary basis, at least $100 million in

2

securities. For a broker-dealer, the threshold for QIB status is $10 million, and banks and savings and loan associations must also have a net worth of at least $25 million to satisfy the QIB criteria. 17 C.F.R. § 230.144A.

4.     The Defendant's decision created two classes of holders of Class Notes with very unequal rights not based on any specific term of the Indentures, and in fact, in violation of the terms of the Indenture. On one hand, the QIBs were entitled to exchange Class Notes for new, secured 8.00% 1.5L Notes. On the other hand, the non-QIBs were denied the opportunity to participate in the Exchange Offer.

5.     In a sad twist of irony, the Defendant disclosed its views on the risks associated with the Exchange Offer, including the risk of not exchanging Class Notes into 8.00% 1.5L Notes, only to those they picked to give the enviable choice of participation, while staying silent (publicly) with respect to those denied the participation opportunity. As a result, Class members were not only precluded from participating in the Exchange Offer, but were kept in the dark regarding Defendant's view of the Exchange Offer and the manner in which it described the Exchange Offer—and its effect on the Class Notes—to the QIBs and non-U.S. persons eligible to participate.

6.     The direct effect of the Exchange Offer and the issuance of the 8.00% 1.5L Notes is that the obligations evidenced by the Class Notes are now subordinate to the obligations evidenced by the 8.00% 1.5L Notes. While the Class Notes are senior unsecured obligations of Defendant, which rank equally in right of payment with all of Defendant's existing and future senior indebtedness, the Exchange Offer subordinates the Class Notes held by Class members to the QIBs who elected to exchange their Class Notes for 8.00% 1.5L Notes. In doing so, Defendant impaired Class members' right to receive payment of the principal and interest under

3

the Class Notes and the right to institute suit to compel such payment.  This disregard for the rights of Plaintiffs and other holders of Class Notes violated Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb (the "**TIA**"), and the Indentures themselves. Indeed, the TIA was intended to protect such minority holders from conduct of issuers and trustees, as present here.

7.      The Defendant's decision to pursue this transaction benefiting only themselves and a minority of holders of Class Notes violated the implied covenant of good faith and fair dealing.  The decision of the Defendant to engage in a private exchange offer for existing notes open only to QIBs, notwithstanding the fact that the Class Notes were registered securities that were purchased by non-QIBs, was unfair to holders of Class Notes who were excluded from the private exchange offer.  The risk of such an Exchange Offer was not disclosed by the Defendant in their offering prospectuses for the Class Notes, nor could it have been foreseen by Plaintiffs or the other Class members at the time they purchased their Class Notes.

8.      It is pervasive throughout the Indentures that holders of Class Notes shall not be treated differently. For example, the Indentures require, with respect to each series of Class Notes:

     a. that, if less than all of a series of the Class Notes is to be redeemed, Class Notes of that series be selected for redemption in a "*fair and appropriate*" manner, or in accordance with the standard procedures of the Depositary (as defined in Section 1.1 of the Base Indenture),

     b. that any Change of Control Offer (as defined in Sections 2.01 of the Supplemental Indentures) be made available to *each* holder of Class Notes, and

     c. that, upon a Change of Control Triggering Event (as defined in Sections 2.01 of the Supplemental Indentures), *each* holder of Class Notes has the right to require the Defendant to purchase that holder's Class Notes pursuant to the Defendant's Change of Control Offer.

9.      As a result of the Exchange Offer, Defendant unjustly enriched itself, reducing its indebtedness, while impairing the rights of Plaintiffs and other Class members to receive principal and interest and reducing the value of the Class Notes. Plaintiffs, on behalf of themselves and all others similarly situated, seek damages against Defendant and other appropriate relief.

## II.   JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b).

11.     Furthermore, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this action is a class action in which the matter in controversy exceeds $5 million, and one or more members of the Class are citizens of a state different from the Defendant.

12.     Supplemental jurisdiction in this Court over Plaintiffs' state law claims is proper under 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over the Defendant under N.Y. C.P.L.R. § 302(a) because Defendant maintains sufficient minimum contacts in this jurisdiction, including the marketing and sale of the Class Notes and the marketing and exchange of the 8.00% 1.5L Notes.

14.     Venue in this District is proper under Section 322(b) of the TIA, 15 U.S.C. § 77 vvv(b), and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1391(b) and (c).  The Defendant transacts business within this District, and a substantial part of the events giving rise to the claims occurred in this District, including the marketing and sale of the Class Notes and the marketing and exchange of the 8.00% 1.5L Notes.  Moreover, each of

the Indentures provides that it, and the Class Notes to which it pertains, shall be governed by the laws of the State of New York.

## III.   PARTIES

15.     Plaintiff Gary Waxman acquired 5.90% Notes prior to the announcement of the Exchange Offer and has continued to hold 5.90% Notes at all times relevant to this action.  Mr. Gary Waxman is not a QIB within the meaning of Rule 144A of the Securities Act, and is a U.S. person within the meaning of Regulation S of the Securities Act, and was therefore ineligible to participate in the Exchange Offer.

16.     Plaintiff Leonard Hammerschlag acquired 6.25% Notes prior to the announcement of the Exchange Offer and has continued to hold 6.25% Notes at all times relevant to this action.  Mr. Leonard Hammerschlag is not a QIB within the meaning of Rule 144A of the Securities Act, and is a U.S. person within the meaning of Regulation S of the Securities Act, and was therefore ineligible to participate in the Exchange Offer.

17.     Defendant Cliffs Natural Resources Inc. is an Ohio corporation with its principal executive offices in Cleveland, Ohio.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   CLIFFS' BACKGROUND AND DEBT.

18.     Cliffs is a publicly traded corporation. It is "a leading mining and natural resources company in the United States. [Cliffs is] a major supplier of iron ore pellets to the North American steel industry from [its] mines and pellet plants located in Michigan and Minnesota. Additionally, Cliffs operates an iron ore mining complex in Western Australia." Cliffs Natural Resources Inc. Form 10-K for the period ended December 31, 2015, a copy of which is attached as Exhibit B hereto, p. 4.  Cliffs' common units are listed on the New York Stock Exchange under the symbol "CLF."

19.     Cliffs, like many other mining and natural resources companies, has faced severe challenges from recent declines in commodity prices.  In its most recent annual report, Cliffs stated

> Based on our outlook for 2016, which is subject to continued changing demand from steelmakers that utilize our products and volatility in iron ore and domestic steel prices, we expect our anticipated capital expenditures and cash requirements to service our debt obligations during the next 12 months to exceed our estimated operating cash flows.

Cliffs Natural Resources Inc. Form 10-K for the period ended December 31, 2015, p. 69.

20.     Additionally, Cliffs stated that

> [D]ue to lower demand for our products and the decline in the prices for our products, we have incurred, and continue to incur, operating losses. We also have significant capital requirements, including interest payments to service our debt. If we incur significant losses in future periods, we may be unable to continue as a going concern. If we are unable to continue as a going concern, we may consider, among other options, restructuring our debt; however, there can be no assurance that these options will be undertaken and, if so undertaken, whether these efforts will succeed.

Cliffs Natural Resources Inc. Form 10-K for the period ended December 31, 2015, p. 20.

21.     Cliffs' financial troubles have affected its ability to repay the Class Notes.  On November 16, 2015, Moody's Investor Service ("**Moody's**") announced that it had placed Cliffs' corporate family rating under review for downgrade.  *See* Moody's, "Rating Action: Moody's places Cliffs' ratings (B1 CFR) under review for downgrade," Nov. 16, 2015, available at https://www.moodys.com/research/Moodys-places-Cliffs-ratings-B1-CFR-under-review-for-downgrade--PR_339150, a copy of which is attached as Exhibit C hereto.  On January 5, 2016, Moody's announced that it downgraded Cliffs' corporate family rating to Caa1 from B1 and the Class Notes' rating to Caa2 from B3, both with a negative outlook.  *See* Moody's "Rating Action: Moody's downgrades Cliffs' ratings (CFR to Caa1) outlook negative," Jan. 5, 2016, available   at   https://www.moodys.com/research/Moodys-downgrades-Cliffs-ratings-CFR-to-

Caa1-outlook-negative--PR_341998, a copy of which is attached as Exhibit D hereto.  Moody's

explained that:

> *The downgrade reflects the deterioration in the company's debt protection metrics and increase in leverage as a result of continued downward movement in iron ore prices and weak fundamentals in the US steel industry, which are resulting in lower shipment levels*. With the reduction in realized iron ore prices in the company's US iron ore operations (USIO), although realizations are higher than the seaborne market, and roughly breakeven nature of the Asia Pacific iron ore operations (APIO), EBIT/interest for the twelve months ended September 30, 2015 has contracted to roughly 0.75x while leverage, as measured by the debt/EBITDA ratio, has increased to around 7.5x. Given our expectations for reduced shipments in 2016 and for seaborne iron ore prices (62%Fe) to average $40/ton with a stress case assumption of $30/ton, leverage in 2016 is expected to increase significantly, well into the double digits with interest coverage remaining well below 1x. *Based upon the company's disclosures as to realized revenues-per-ton at various IODEX prices over the October - December 2015 time frame, we would not anticipate a material difference as we look at 2016 ranges*.

*Id*. (emphasis added.)

22.     As of December 31, 2015, the Defendant had approximately $2.898 billion of

funded debt.  Cliffs Natural Resources Inc. Form 10-K for the period ended December 31, 2015,

p. 106.

23.     As of December 31, 2015, the Defendant had approximately $412.5 million of

principal amount of 4.875% Senior Notes due 2021 (CUSIP 18683KAD3) (the "**4.875% Notes**")

outstanding.  *Id*.

24.     As of December 31, 2015, the Defendant had approximately $306.7 million of

principal amount of 4.80% Senior Notes due 2020 (CUSIP 18683KAB7) (the "**4.80% Notes**")

outstanding.  *Id*.

25.     As of December 31, 2015, the Defendant had approximately $492.8 million of

principal amount of 6.25% Notes outstanding.  *Id*.

26.     As of December 31, 2015, the Defendant had approximately $290.8 million of

principal amount of 5.90% Notes outstanding.  *Id*.

27.     As of December 31, 2015, the Defendant had approximately $311.2 million of principal amount of 3.95% Notes due 2018 (CUSIP 18683KAF8) (the "**3.95% Notes**") outstanding.  *Id.*

28.     As of December 31, 2015, the Defendant had approximately $540.0 million of principal amount of 8.25% First Lien Notes due 2020 (the "**8.25% 1L Notes**") issued by the Defendant outstanding.  *Id.*

29.     As of December 31, 2015, the Defendant had approximately $544.2 million of principal amount of 7.75% Second Lien Notes due 2020 (the "**7.75% 2L Notes**") issued by the Defendant outstanding.  *Id.*

30.     The Defendant also has a $550 million Syndicated Facility Agreement, dated as of March 30, 2015, by and among: Bank of America, N.A., as administrative agent and Australian security trustee; certain lenders; and Cliffs and its subsidiaries as borrowers (the "**ABL Facility**").  *Id.*  As of December 31, 2015, "no loans were drawn under the $550.0 million ABL Facility and [Cliffs] had total availability of $366.0 million as a result of borrowing base limitations."  *Id.*, p. 108.

### B.     CLIFFS CONDUCTS THE EXCHANGE OFFER.

31.     On January 27, 2016, Defendant announced the commencement of the Exchange Offer, whereby certain eligible holders of the Class Notes would be given the opportunity to exchange those bonds for 8.00% 1.5L Notes. Cliffs, Press Release, "Cliffs Natural Resources Inc. Announces Exchange Offers for Senior Notes," Jan. 27, 2016, available at http://ir.cliffsnaturalresources.com/English/investors/news-releases/news-releases-details/2016/Cliffs-Natural-Resources-Inc-Announces-Exchange-Offers-for-Senior-Notes/default.aspx,  a copy of which is attached as Exhibit E hereto.

32.     Because Defendant chose not to register the 8.00% 1.5L Notes under the Securities Act, the Exchange Offer was extended only to holders of Class Notes who were QIBs within the meaning of Rule 144A or non-U.S. persons within the meaning of Rule 902(k) of Regulation S.  Plaintiffs and the Class were not given the opportunity to participate in the Exchange Offer, or even to receive the exchange memorandum made available to eligible holders of Class Notes informing them of how the Exchange Offer would affect their interests in the Class Notes.

33.     The exact terms of the Exchange Offer are presumably set forth in an offering memorandum.  Eligible holders participating in the Exchange Offer received between $340 and $500 in 8.00% 1.5L Notes for each $1,000 principal amount of Class Notes tendered (depending on when the holders tendered).  While investors who accepted the Exchange Offer and exchanged their Class Notes for 8.00% 1.5L Notes agreed to reduced principal amounts and later maturity date, they collect a higher interest rate and enjoy a substantial advantage over the Class Notes by virtue of their 1.5 lien security interest in the Defendant' property.  This right provides holders of the 8.00% 1.5L Notes a superior position to holders of the Class Notes should the Class members seek remedies to enforce payment obligations under the Class Notes against the assets of the Defendant, and therefore is especially valuable in light of the Defendant's financial condition.

34.     The 8.00% 1.5L Notes are senior secured 1.5 lien obligations of the Defendant that are

> jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of [Cliffs'] material domestic subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) on (a) a junior first-priority basis by the notes collateral of [Cliffs], which secures the [8.25% 1L Notes] obligations on a senior first-priority basis, [Cliffs' 7.75% 2L Notes] obligations on a second-priority basis and [Cliffs' ABL Facility]

> obligations on a third-priority basis, and (b) a junior second-priority basis by the ABL [Facility] collateral of [Cliffs], which secures the [ABL Facility] obligations on a first-priority basis, the [8.25% 1L Notes] obligations on a senior second-priority basis and the [7.75% 2L Notes] obligations on a third-priority basis.

Cliffs Natural Resources Inc. Form 8-K filed March 2, 2016, a copy of which is attached as Exhibit F hereto.

35.     Due to these lien priority rights, the 8.00% 1.5L Notes are effectively senior, to the extent of the value of the Defendant's assets that serve as collateral, to all existing and future unsecured indebtedness of the Defendant, including the Class Notes.  The 8.00% 1.5L Notes, unlike the Class Notes, are unconditionally and irrevocably guaranteed by Cliffs' subsidiaries and, thus, are effectively senior to all existing and future unsecured senior indebtedness of those guarantors to the extent of the value of the collateral.

36.     The Exchange Offer expired at 11:59 PM, New York City time, on February 26, 2016.  *See* Cliffs Natural Resources Inc. Press Release, Feb. 29, 2016, available at http://ir.cliffsnaturalresources.com/English/investors/news-releases/news-releases-details/2016/Cliffs-Natural-Resources-Inc-Announces-Final-Results-of-Exchange-Offers-for-Senior-Notes/default.aspx, a copy of which is attached as Exhibit G hereto.

37.     On February 29, 2016, Defendant announced the Exchange Offer's final results. *Id*.

38.     On February 29, 2016, Defendant reported that approximately $65.1 million aggregate principal amount of 5.90% Notes, representing approximately 22.4% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id*.

39.     Following the consummation of the Exchange Offer, approximately $225.7 million aggregate principal amount of 5.90% Notes, representing approximately 77.6% of the outstanding principal amount had not been exchanged.  *Id*.

40. On February 29, 2016, Defendant reported that approximately $194.4 million aggregate principal amount of 6.25% Notes, representing approximately 39.4% of the outstanding principal amount, had been validly tendered and not withdrawn. *Id*.

41. Following the consummation of the Exchange Offer, approximately $298.4 million aggregate principal amount of 6.25% Notes, representing approximately 60.6% of the outstanding principal amount had not been exchanged. *Id*.

42. On February 29, 2016, Defendant reported that approximately $17.6 million aggregate principal amount of 3.95% Notes, representing approximately 5.7% of the outstanding principal amount, had been validly tendered and not withdrawn. *Id*.

43. Following the consummation of the Exchange Offer, approximately $293.6 million aggregate principal amount of 3.95% Notes, representing approximately 94.3% of the outstanding principal amount had not been exchanged. *Id*.

44. Thus, approximately $277.1 million aggregate principal amount of Class Notes had been validly tendered and not withdrawn. *Id*.

45. In addition, Defendant reported on February 29, 2016 that approximately $44.7 million aggregate principal amount of 4.80% Notes, representing approximately 14.6% of the outstanding principal amount, had been validly tendered and not withdrawn. *Id*.

46. Following the consummation of the Exchange Offer, approximately $262 million aggregate principal amount of 4.80% Notes, representing approximately 85.4% of the outstanding principal amount had not been exchanged. *Id*.

47. On February 29, 2016, Defendant reported that approximately $76.3 million aggregate principal amount of the 4.875% Notes, representing approximately 18.5% of the outstanding principal amount, had been validly tendered and not withdrawn. *Id*.

48.     Following the consummation of the Exchange Offer, approximately $336.2 million aggregate principal amount of 4.875% Notes, representing approximately 81.5% of the outstanding principal amount had not been exchanged.  *Id*.

49.     On February 29, 2016, Defendant reported that approximately $114 million aggregate principal amount of 7.75% 2L Notes, representing approximately 20.9% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id*.

50.     Following the consummation of the Exchange Offer, approximately $430.2 million aggregate principal amount of 7.75% 2L Notes, representing approximately 79.1% of the outstanding principal amount had not been exchanged.  *Id*.

51.     Thus, on February 29, 2016, Defendant reported that $398.1 million aggregate principal amount of Class Notes and $114 million aggregate principal amount of 7.75% 2L Notes had been validly tendered and not withdrawn.  *Id*.

52.     The settlement date for the Exchange Offer was March 2, 2016, on which date Defendant issued $218,545,000 in aggregate principal amount of 8.00% 1.5L Notes to the eligible holders who participated in the Exchange Offer.  Cliffs Natural Resources Inc. Form 8-K filed on March 2, 2016.

53.     On March 2, 2016, the Defendant issued the 8.00% 1.5L Notes to eligible holders of Class Notes who tendered their Class Notes pursuant to an indenture (the "**8.00% 1.5L Notes Indenture**") by and between the Defendant, the guarantors party thereto, and U.S. Bank, as indenture Trustee and Collateral Trustee (as each term is defined in the 8.00% 1.5L Notes Indenture).  *Id*.

54.     The 8.00% 1.5L Notes were issued in accordance with exemptions from the registration requirements of the Securities Act afforded by Rule 144A and Regulation S under the Securities Act.  *Id.*

55.     U.S. Bank serves as the notes collateral agent with respect to the 8.00% 1.5L Notes.  *Id.*

## C.     THE EXCHANGE OFFER DAMAGED PLAINTIFFS AND OTHER CLASS MEMBERS WHO WERE NOT ENTITLED TO PARTICIPATE.

56.     Because Plaintiffs and other Class members are not QIBs and are U.S. persons, Plaintiffs and other Class members were denied the opportunity to participate in the Exchange Offer, or even to receive an offering memorandum pertaining thereto.

57.     Not only did the Exchange Offer have the negative practical implications discussed above (amongst others), but it also breached Plaintiffs' and the Class's rights under the Indentures.

## D.     THE REGISTRATION AND ISSUANCE OF THE CLASS NOTES.

58.     The Class Notes were registered pursuant to the Registration Statement on Form S-3 filed with the U.S. Securities and Exchange Commission (the "**SEC**") on March 10, 2010 (the "**Registration Statement,**"a copy of which is attached as Exhibit H hereto).   The Class Notes were issued pursuant to Prospectus Supplements filed with the SEC pursuant to Rule 424(b)(5) of the Securities Act, as follows:

(a) the 5.90% Notes were issued pursuant to a Prospectus Supplement filed pursuant to Rule 424(b)(5) of the Securities Act on March 11, 2010 (a copy of which is attached as Exhibit I hereto);

(b) the 6.25% Notes, as well as the 4.80% Notes, were issued pursuant to a Prospectus Supplement filed pursuant to Rule 424(b)(5) of the Securities Act on September 16, 2010 (a copy of which is attached as Exhibit J hereto); and

(c) an additional amount of 6.25% Notes, as well as the 4.875% Notes, were issued pursuant to a Prospectus Supplement filed pursuant to Rule 424(b)(5) of the Securities Act on March 17, 2011  (a copy of which is attached as Exhibit K hereto).

59.     These Prospectus Supplements supplemented the Registration Statement.  At the time Defendant registered the Class Notes, they purported to meet all the reporting requirements listed under sections 12 or 15(d) of the Securities Exchange Act of 1934, which assumes that the company seeking registration already has some form of security registered with the SEC.

60.     On March 17, 2010, Cliffs entered into the First Supplemental Indenture for the issuance of the 5.90% Notes (as amended by the Fifth Supplemental Indenture, defined herein, the "**First Supplemental Indenture**").  Cliffs Natural Resources Inc. Form 8-K filed on March 16, 2010, Ex. 4.2, a copy of which is attached as Exhibit L hereto. U.S. Bank is trustee under the First Supplemental Indenture.  *Id*.

61.     On September 20, 2010, Cliffs entered into the Third Supplemental Indenture for the issuance of 6.25% Notes (as amended by the Fifth Supplemental Indenture, defined herein the "**Third Supplemental Indenture**" and together with the First Supplemental Indenture and the Firth Supplemental Indenture, the "**Supplemental Indentures**").  Cliffs Natural Resources Inc. Form 8-K filed on September 17, 2010, Ex. 4.4, a copy of which is attached as Exhibit M hereto.  U.S. Bank is trustee under the Third Supplemental Indenture.  *Id*.

62.     On March 31, 2011, Cliffs entered into the Fifth Supplemental Indenture, amending the terms of, *inter alia*, the First Supplemental Indenture (governing the 5.90% Notes), and the Third Supplemental Indenture (governing the 6.25% Notes).  Cliffs Natural Resources Inc. Form 10-Q for the quarter ended March 31, 2011, Ex. 4(b) (the "**Fifth Supplemental Indenture**," a copy of which is attached as Exhibit N hereto).  U.S. Bank is trustee under the Fifth Supplemental Indenture.  *Id.*

    E.     **KEY PROVISIONS OF THE INDENTURES.**

63.     Under the Base Indenture, all holders have the right to receive payment of principal and interest. Specifically, Section 6.8 of the Base Indenture provides:

> Notwithstanding any other provision in this Indenture, ***the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest***, if any, on such Security on the Stated Maturity or Stated Maturities expressed in such Security (or, in the case of redemption, on the redemption date) and ***to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder***.

Base Indenture, § 6.8 (emphasis added).

64.     The provisions of Section 6.8 of the Base Indenture are mandated by Section 316(b) of the TIA, 15 U.S.C. § 77ppp(b), which the Base Indenture acknowledges.  *See* Base Indenture, at [iii].

65.     Section 6.7 of the Base Indenture (the "**No-Action Clause**") provides that:

No Holder of any Security of any Series shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a) such Holder has previously given written notice to the of a continuing Event of Default with respect to the Securities of that Series;

(b) the Holders of not less than 25% in principal amount of the outstanding Securities of that Series shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c) such Holder or Holders have offered to the Trustee security or indemnity reasonably satisfactory to the Trustee against the costs, expenses and liabilities to be incurred in compliance with such request;

(d) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e) no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of a majority in principal amount of the outstanding Securities of that Series;

it being understood and intended *that no on one or more of such Holders shall have any right in any matter whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all such Holders*. The Trustee shall mail to all Holders any notice it receives from Holders under this Section 6.7.

Base Indenture, § 6.7 (emphasis added).

66.    Section 3.2 of the Base Indenture requires that in the case of any redemption of less than all of a series of Class Notes, the Class Notes to be redeemed must be selected in a "fair and appropriate" manner, or in accordance with the Depositary's standard procedures, as expressly stated:

Unless otherwise indicated for a particular Series by the supplemental indenture hereto or an Officers' Certificate, if less than all the Securities of a Series are to be redeemed, and the Securities are Global Securities, the particular Securities to be redeemed shall be *selected by the Depositary in accordance with its standard procedures*. If the particular Securities to be redeemed are not Global Securities, the Trustee shall select the Securities of the Series to be redeemed in *any manner that the Trustee deems fair and appropriate*.

Base Indenture, § 3.2 (emphasis added).

67.    Moreover, Section 3.01 of each Supplemental Indenture requires that an offer to repurchase upon a Change of Control (as such term is defined in each of the Supplemental Indentures) must be made to *each* Holder of Class Notes. For instance, Section 3.01 of the First Supplemental Indenture provides, in relevant part:

17

(a) Upon the occurrence of a Change of Control Triggering Event, unless the Company has exercised its right to redeem the Notes pursuant to Section 5.01, by giving irrevocable notice to the Trustee in accordance with the Indenture, ***each Holder of the Notes shall have the right to require the Company to purchase all or a portion of such Holder's Notes pursuant to the offer described in this Section 3.01*** (the "Change of Control Offer"), at a purchase price equal to 101% of the principal amount thereof plus accrued and unpaid interest, if any, to the date of purchase (the "Change of Control Payment"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

(b) Unless the Company has exercised its right to redeem the Notes, within 30 days following the date upon which the Change of Control Triggering Event occurred with respect to the Notes or, at the Company's option, prior to any Change of Control but after the public announcement of the pending Change of Control, ***the Company shall be required to send, by first class mail, a notice to each Holder of Notes***, with a copy to the Trustee, which notice shall govern the terms of the Change of Control Offer. Such notice shall state, among other things, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date such notice is mailed, other than as may be required by law (the "Change of Control Payment Date"). The notice, if mailed prior to the date of consummation of the Change of Control, shall state that the Change of Control Offer is conditioned on the Change of Control being consummated on or prior to the Change of Control Payment Date.

First Supplemental Indenture, § 3.01 (emphasis added).

68.     The Third Supplemental Indenture contains a substantially similar to the provision in paragraph 69. *See* Third Supplemental Indenture, § 3.01.

69.     U.S. Bank is the Trustee under all of Indentures. Base Indenture, § 1.1 (definition of "Trustee") and [1]; p.1 of each Supplemental Indenture.

70.     Section 10.10 of the Base Indenture states in relevant part that "THIS INDENTURE AND THE SECURITIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT REGARD GO THE CONFLICT OF LAWS PROVISIONS THEREOF." Base Indenture, § 10.10 (emphasis in original).

71.     Section 7.01 of each Supplemental Indenture states in relevant part that it and the series of Class Notes issued thereunder "WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OF CONFLICTS OF LAWS" (emphasis in original).  First Supplemental Indenture, § 7.01; Third Supplemental Indenture, § 7.01.  The Fifth Supplemental Indenture contains a substantially similar provision.  Fifth Supplemental Indenture, § 4.01.

### F.     THE NO-ACTION CLAUSE DOES NOT BAR THIS ACTION.

72.     The No-Action Clause of the Base Indenture does not bar this action.  Sections (d) and (e) of the No-Action Clause provide for a 60-day waiting period during which U.S. Bank, as trustee, must wait for guidance from a majority of the noteholders after receiving a written request to initiate an action from 25% or more of the noteholders.  Here, Defendant announced the Exchange Offer on January 27, 2016, the Exchange Offer expired on February 26, 2016, and settlement of the Exchange Offer occurred on March 2, 2016, on which day the 8.00% 1.5L Notes and attendant security interest were issued and granted.  Thus, noteholders were incapable of challenging the Exchange Offer through U.S. Bank, since the Exchange Offer was scheduled to close after only approximately a month, well before the 60-day waiting period could run.

73.     Moreover, U.S. Bank itself is subject to a debilitating conflict of interest preventing it from bringing claims with respect to the Exchange Offer.  U.S. Bank is the trustee for both the Class Notes and the 8.00% 1.5L Notes.  Additionally, U.S. Bank is also the collateral agent for the 8.00% 1.5L Notes.  U.S. Bank is receiving compensation for the new services it provides under the 8.00% 1.5L Notes and related security and collateral agreements.  As such, if U.S. Bank successfully challenged the Exchange Offer, it would lose out on the fees that it would otherwise earn as trustee for the 8.00% 1.5L Notes.

74.     Because it was impossible for Plaintiffs or any holders of the Class Notes to comply with the No-Action Clause before the Exchange Offer expired, and because U.S. Bank faced its own conflict of interest preventing it from challenging the Exchange Offer on its own initiative, the No-Action Clause does not apply here.

## V.    CLASS ACTION ALLEGATIONS

75.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class, defined as:

> all persons who beneficially held Class Notes during the period February 29, 2016 to the present, who are not QIBs within the meaning of Rule 144A of the Securities Act, and who are U.S. persons within the meaning of Rule 902(k) of Regulation S of the Securities Act.

76.     Upon information and belief, the members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  While approximately $783.6 million in aggregate principal amount of Class Notes was outstanding prior to the Exchange Offer, approximately $259.5 million aggregate principal amount of Class Notes were tendered in the Exchange Offer.  Thus, approximately $524.1 million in principal amount of Class Notes were not tendered in the Exchange Offer.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds of members in the proposed Class.

77.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.      whether Defendant's actions violated the TIA;

b.      whether Defendant's actions breached the Indentures;

    c.      whether Defendant's actions breached the implied covenant of good faith and fair dealing with respect to the Indentures; and

    d.      the extent of damages sustained by Class members, and the appropriate measure of damages or declaratory relief.

78.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendant's wrongful conduct.

79.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities, restructuring, and indenture litigation. Plaintiffs have no interests which conflict with those of the Class.

80.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.    CAUSES OF ACTION

### COUNT ONE
### The Trust Indenture Act – 15 U.S.C. §§ 77aaa, *et seq.*

81.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

82.    The Class Notes are debt securities qualified under the TIA, which regulates debt securities.

83.    Section 316(b) of the TIA, 15 U.S.C. § 777ppp(b), requires that Plaintiffs' and other noteholders' right to receive payment of principal and interest on a debt security on or after their respective due dates expressed in the Indentures shall not be impaired or affected without the consent of each holder.   Section 316(b) further provides that Plaintiffs' and other noteholders' right to institute suit to compel such payment, may not be impaired by the Indentures, without the consent of each holder.

84.     The Exchange Offer impaired the rights of Plaintiffs and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment because their Class Notes are now subordinated to 8.00% 1.5L Notes with respect to assets of the Defendant to which the 8.00% 1.5L Notes have liens.

85.     Defendant did not have the consent of Plaintiffs or the Class to consummate and finalize the Exchange Offer, or to otherwise impair Plaintiffs' and the Class's rights under the Indentures governing the Class Notes.

86.     Defendant thereby violated the TIA.  Plaintiffs and the Class have suffered damages as a result of Defendant's violations of the TIA and will continue to be damaged in the future.

87.     Accordingly, Plaintiffs and the Class are entitled to the declaratory relief sought in Count Five.

**COUNT TWO**
**Breach of Contract, Base Indenture, Section 6.8**

88.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

89.     The Indentures, including the Base Indenture, were at all relevant times valid and enforceable contracts.

90.     Section 6.8 of the Base Indenture promised Plaintiffs and members of the Class the unconditional right to receive principal and interest payments from Defendant and to institute suit to compel such payment without the consent of each holder. Base Indenture, § 6.8.

91.     The Exchange Offer impaired the rights of Plaintiffs and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment

because their Class Notes are now subordinated to 8.00% 1.5L Notes with respect to assets of Defendant to which the 8.00% 1.5L Notes have liens.

92.     Defendant did not have the consent of Plaintiffs or the Class to consummate and finalize the Exchange Offer, or to otherwise impair Plaintiffs' and the Class's rights under the Indentures governing the Class Notes.

93.     Accordingly, Plaintiffs and the Class are entitled to the declaratory relief sought in Count Five.

94.     In addition, as a result of the Defendant's breach of the Base Indenture, Plaintiffs and the Class have suffered damages in an amount to be determined at trial.

## COUNT THREE
### Breach of the Implied Covenant of Good Faith and Fair Dealing

95.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

96.     The Indentures were at all relevant times valid and enforceable contracts.

97.     Like all contracts under New York law, the Indentures incorporate an implied covenant of good faith and fair dealing.

98.     The Defendant's course of conduct violated the implied covenant of good faith and fair dealing and public policy because:

> a.  Defendant disregarded the fact that the Class Notes were securities, registered pursuant to the Securities Act, that could be purchased by anyone, irrespective of whether such person was a QIB or a not a QIB;
>
> b.  Through the Exchange Offer, Defendant voluntarily engaged in a private exchange offer, offered the QIBs only the opportunity to exchange their Class Notes for new 8.00% 1.5L Notes, and leaving the QIBs in the

enviable position of being able to decide whether to participate in the Exchange Offer;

c. As a consequence of Defendants decision to make a private exchange offer of unregistered securities, Defendant deprived the non-QIBs of the ability to make the decision offered to the QIBs;

d. The Defendants did so, thus thwarting the non-QIBs ability to participate in the Exchange Offer, notwithstanding the fact that the Class Notes were previously registered and eligible to be purchased by non-QIBs; and

e. The Defendants also did so, notwithstanding the fact that the Indentures require:

    i. non-prejudicial actions by holders of Class Notes in enforcing their rights under the Base Indenture and specific Supplemental Indenture governing the relevant Class Notes (*see* Base Indenture, §§ 6.7, 6.12);

    ii. if less than all of a series of Class Notes are redeemed, that Class Notes of that series be selected for redemption in a "fair and appropriate" manner by the Trustee or in accordance with the Depositary's standard procedures for Global Securities (as defined in the Indenture) (*see* Base Indenture, § 3.03); and

    iii. that each holder of Class Notes shall have the right to require Defendant to purchase that holder's Class Notes pursuant to the terms of the Change of Control Offer be mailed to each holder of

Class Notes (*see* First Supplemental Indenture, § 3.01; Third Supplemental Indenture, § 3.01).

99.     Among other things, the provisions of the Base Indenture, First Supplemental Indenture, and Third Supplemental Indenture referred to in the preceding paragraph demonstrate that, under the Indentures, the holders of Class Notes were to be treated equally irrespective of whether such holders were QIBs or non-QIBs.

100.    Defendant's actions deprived Plaintiffs of the benefit of their bargain under the Indentures.  Indeed, Defendant's actions will ultimately deprive Plaintiffs of the ultimate benefit of the Indentures – the right to receive payment of principal and interest.

101.    No reasonable person would have anticipated the Defendant's course of conduct. If it had been disclosed that the Defendant might offer an advantageous exchange offer to only the QIBs, but not to the non-QIBs, no reasonable non-QIB would have entered into the contract.

102.    Defendant thereby breached the implied covenant of good faith and fair dealing. Plaintiffs and the Class have suffered damages as a result of Defendant's breach of the implied covenant and will continue to be damaged in the future.

## COUNT FOUR
### Unjust Enrichment

103.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

104.    By entering into the Exchange Offer, Defendant unjustly enriched itself.  The Exchange Offer allowed Defendant to eliminate hundreds of millions of debt incurred under the Indentures.

105.    The Exchange Offer enriched Defendant at the expense of Plaintiffs and the Class.  As a direct and intentional result of the Exchange Offer, the Class Notes held by Plaintiffs

and the Class have been subordinated to the 8.00% 1.5L Notes with respect to assets of the Defendant to which the 8.00% 1.5L Notes have liens, reducing the value of the Class Notes and impairing the rights of Plaintiffs and other Class members under the Indentures to receive interest and principal.

106.    Equity and good conscience militate against permitting Defendant to retain the benefits of the Exchange Offer, since those benefits were obtained by intentionally violating Plaintiffs' and the Class's contractual rights under the Indentures in a discriminatory manner.

**COUNT FIVE**
**Declaratory Judgment**

107.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

108.    An actual controversy exists between Plaintiffs and Defendant regarding the validity and enforceability of the Exchange Offer and the 8.00% 1.5L Notes, and a declaration of rights under the Indentures is necessary and appropriate to establish that the Exchange Offer is ineffective and that the Liens purportedly created in the Exchange Offer for the benefit of the 8.00% 1.5L Notes are null and void, ineffective and invalid.

109.    Under the TIA, Defendant was prohibited from impairing the rights of Plaintiffs and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment.

110.    The Exchange Offer impaired the rights of the Plaintiffs and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment because their Class Notes are now subordinated to 8.00% 1.5L Notes with respect to assets of the Defendant to which the 8.00% 1.5L Notes have liens.  Defendant did not have the consent of

Plaintiffs or the Class to consummate and finalize the Exchange Offer, or to otherwise impair Plaintiffs' and the Class's rights under the Indentures governing the Class Notes.

111.     Accordingly, Plaintiffs request a declaration, pursuant to 28 U.S.C. § 2201, that the Exchange Offer is null and void, ineffective and invalid, that any Liens created in the Exchange Offer for the benefit of the 8.00% 1.5L Notes are null and void, ineffective and invalid, and that the Exchange Offer resulted in an Event of Default (as such term is defined in the Indentures).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiffs and the Class the declaratory relief requested herein;

C.     Awarding Plaintiffs and the Class damages, in an amount to be determined at trial;

D.     Awarding Plaintiffs reasonable costs and attorneys' fees; and

E.     Awarding such equitable, injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated: March 14, 2016

        **GRANT & EISENHOFER P.A.**        **GARDY & NOTIS, LLP**

                                                        By: */s/ Meagan Farmer*

Jay W. Eisenhofer                         Mark C. Gardy
Gordon Z. Novod                        James S. Notis
485 Lexington Avenue, 29th Floor      Meagan Farmer
New York, New York 10017            Tower 56
Tel:  646-722-8500                    126 East 56th Street, 8th Floor
Fax:  646-722-8501                   New York, New York 10022
                                           Tel:  212-905-0509
                                           Fax:  212-905-0508

                                          *Attorneys for Plaintiff*