UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

GARY WAXMAN and LEONARD
HAMMERSCHLAG, Individually and On                    16 Civ. 1899
Behalf of All Others Similarly Situated,

                                                         OPINION

                          Plaintiffs,

       -against-

CLIFFS NATURAL RESOURCES INC.,

                          Defendant.

-----------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 12/6/16

A P P E A R A N C E S:

            Attorneys for Plaintiff

            GRANT & EISENHOFER P.A.
            485 Lexington Avenue
            29th Floor
            New York, NY 10017
            By:  Gordon Z. Novod

            GARDY & NOTIS, LLP
            501 Fifth Avenue, Suite 1408
            New York, NY 10017
            By:  James S. Notis, Esq.

            GARDY & NOTIS, LLP
            Tower 56
            126 E. 56th Street, 8th Floor
            New York, NY 10022
            By:  Meagan A. Farmer, Esq.

<u>Attorneys for Defendant</u>

JONES DAY
250 Vesey Street, 34th Floor
New York, NY 10281
By:   Robert C. Micheletto, Esq.

JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
By:   Geoffrey J. Ritts, Esq.
      John M. Newman, Jr., Esq.

**Sweet, D.J.**

Cliffs Natural Resources Inc. ("Cliffs" or the "Defendant") has moved under Rule 12(b)(1), F. R. Civ. P. to dismiss the complaint of plaintiffs Gary Waxman ("Waxman") and Leonard Hammerschlag ("Hammerschlag") (collectively, the "Plaintiffs") under Fed. R. Civ. P. 12(b)(1) for lack of Article III standing and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Based upon the conclusions set forth below, the motion of Cliffs is granted, and the complaint of the Plaintiffs is dismissed.

## I.  Prior Proceedings and Facts

The Plaintiffs filed their putative class action complaint (the "Complaint") on March 14, 2016 which contained the following allegations.

Cliffs is a publicly traded corporation and a leading mining and natural resource firm. Complaint ¶ 18. As of the end of 2015, Cliffs had $2.898 billion of funded debt. Complaint ¶ 22. There were seven series of notes outstanding: 3.95% Notes due 2018 ($311.2 million outstanding as of the end of 2015,

Complaint ¶ 27); 4.80% Notes due 2020 ($306.7 million, Complaint ¶ 24); 4.875% Notes due 2021 ($412.5 million, Complaint ¶ 23); 5.9% Notes due 2020 ($290.8 million, Complaint ¶¶ 1, 26); 6.25% Notes due 2040 ($492.8 million, Complaint ¶¶ 1, 25); 7.75% Second Lien ("2L") Notes due 2020 ($544.2 million, Complaint ¶ 29); and 8.25% First Lien ("1L") Notes due 2020 ($540.0 million, Complaint ¶ 28). Cliffs also had a bank borrowing facility from which it could borrow up to $366 million as of year-end 2015. Complaint ¶ 30.

Waxman owns an unspecified number of 5.9% Notes. Complaint ¶ 15. Hammerschlag owns an unspecified number of 6.25% Notes, Complaint ¶ 16. The 5.9% Notes and the 6.25% Notes have been termed the "Class Notes." The Class Notes had a pre-Exchange Offer aggregate outstanding principal of $783.6 million. Complaint ¶¶ 25-26. The 3.95% Notes, the 4.8% Notes, the 4.875% Notes, and the 2L Notes, termed the "Non-Class Notes," had an aggregate outstanding principal of $1.574 billion. Br. at 11.

The Class Notes, like the Non-Class Notes, are governed by a March 17, 2010 Indenture. Complaint ¶ 1 & Ex. A (the "Base Indenture"). All Notes were registered pursuant to a

2

March 10, 2010 Form S-3. Complaint ¶ 58 & Ex. H (the

"Registration Statement"). The 5.9% Notes were issued pursuant

to a March 11, 2010 prospectus supplement, Complaint ¶ 58(a) &

Ex. I (the "5.9% Prospectus Supplement"), and a supplemental

indenture, Complaint ¶ 60 & Ex. L (the "First Supplemental

Indenture"). The 6.25% Notes were issued pursuant to a September

16, 2010 Prospectus Supplement, Complaint ¶ 58(b) & Ex. J (the

"First 6.25% Prospectus Supplement"), a March 17, 2011

Prospectus Supplement, Complaint ¶ 58(c) & Ex. K (the "Second

6.25% Prospectus Supplement"), and two supplemental indentures,

Complaint¶¶ 61-62, Ex. M (the "Third Supplemental Indenture"), &

Ex. N (the "Fifth Supplemental Indenture").

The risk factor in each Prospectus Supplement stated:

"The notes are subject to prior claims of any secured creditors

and the creditors of our subsidiaries, and if a default occurs

we may not have sufficient funds to fulfill our obligations

under the notes." 5.9% Prospectus Supplement at S-7; First 6.25%

Prospectus Supplement at S-9 (same); Second 6.25% Prospectus

Supplement at S-12 (same). The Supplements further stated that

"[t]he indenture governing the notes permits us and our

subsidiaries to incur secured debt under specified

circumstances." 5.9% Prospectus Supplement at S-7 (emphasis

3

added); First 6.25% Prospectus Supplement at S-9 (same); Second
6.25% Prospectus Supplement at S-12 (same). The 5.9% Prospectus
Supplement at S-11 stated: "The notes will be effectively
subordinated to any of our future secured indebtedness to the
extent of the value of the assets securing such indebtedness and
effectively junior to liabilities of our subsidiaries." The
covenants in the Supplemental Indentures provided that Cliffs
and its subsidiaries may, subject to certain restrictions,
"without securing the notes [at issue here], incur, issue,
assume or guarantee secured Debt . . . ." First Supp. Indenture
§ 3.02; Third Supp. Indenture at § 3.02 (same).


    On January 27, 2016, Cliffs announced a voluntary
exchange offer in which certain holders of six different classes
of bonds were offered new bonds in exchange for their existing
bonds (generally, the "Exchange Offer"). Complaint ¶ 31 & Ex. E.
The Exchange Offer allowed eligible holders of the Class Notes
and the Non-Class Notes to exchange their existing bonds for new
bonds that bore an 8% interest rate and ranked between the 1L
and 2L Notes in terms of secured priority (the "1.5L Notes"),
and, in return, the exchanging holders would take significant
haircuts. *Id.* The exchange rate differed by series, and ranged
from $390-$650 in 1.5L Notes per $1000 in original notes

4

exchanged. Exchanging bondholders needed to accept a 35%-61% reduction in principal to receive the new 1.5L Notes. Id., Ex. G. The 5.9% Notes received $400 per $1000 exchanged; the 6.25% Notes received $390 per $1000 exchanged. *Id.* The Class Notes that were exchanged, therefore, incurred at least a 60% reduction in principal.

The Exchange Offer was open only to qualified institutional buyers ("QIBs"), as defined by Rule 144A under the Securities Act, and to holders who were not "U.S. persons," as defined in Regulation S under the Securities Act. *Id.* Plaintiffs fell into neither category, Complaint ¶¶ 15-16, and thus were not eligible to participate.

## II.    The Applicable Standards

District courts in this Circuit analyze motions to dismiss for lack of standing under Rule 12(b)(1). *See Davis v. Kosinsky*, No. 16-CV-1750 (JGK), 2016 WL 6581300, at *1 (S.D.N.Y. Nov. 4, 2016); *Barnett v. Countrywide Bank, FSB*, 60 F. Supp. 3d 379, 385 (E.D.N.Y. 2014); *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, No. 10 Civ. 7498 LTS JCF, 2012 WL 4748151, at *1 (S.D.N.Y. Oct. 4, 2012). When reviewing a

5

Rule 12(b)(1) motion to dismiss, a court "must accept as true all material factual allegations in the complaint, but [may] not [] draw inferences from the complaint favorable to plaintiffs." *J.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004); *see also Davis*, 2016 WL 6581300, at *1 (noting that in considering a motion to dismiss under Rule 12(b)(1), a court "does not [] draw all reasonable inferences in the plaintiff's favor").

"In defending against a motion to dismiss under Rule 12(b)(1), the non-moving party bears the burden of proving the court's subject matter jurisdiction by a preponderance of the evidence." *Sloan v. Michel*, No. 15 CIV. 6963 (LGS), 2016 WL 1312769, at *3 (S.D.N.Y. Apr. 4, 2016); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Davis*, 2016 WL 6581300, at *1. Under Rule 12(b)(1), a court "may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113; *Davis*, 2016 WL 6581300, at *1. A court "may not rely on conclusory or hearsay statements contained in the affidavits," however, in considering evidence outside the pleadings. *Attica Cent. Sch*, 386 F.3d at 110.

The Rule 12(b)(6) standard requires that a complaint plead sufficient facts to state a claim upon which relief can be

6

granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a motion to dismiss under Fed. R. Civ. P 12(b)(6), all factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor. *Littlejohn v. City of N.Y.*, 795 F.3d 297, 306 (2d Cir. 2015); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (quotation marks omitted). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 663 (quoting *Twombly*, 550 U.S. at 570).

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

7

Additionally, while "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" *Munoz-Nagel v. Guess, Inc.*, No. 12-1312, 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)) and *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); *see also Williams v. Calderoni*, No. 11-3020, 2012 WL 691832, *7 (S.D.N.Y. Mar. 1, 2012). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216 (3d ed. 2004)).

## III.    The Plaintiffs Lack Article III Standing

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and

8

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).

The first element, "injury-in-fact," is successfully alleged only when a plaintiff shows "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citations omitted). Even an "objectively reasonable likelihood" of harm is insufficient. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, *1147* (2013). Instead, for an injury to be "actual or imminent," it must at least be "certainly impending." *Id.* at 1148.

For an injury-in-fact, harms, including economic harms, must be imminent or actual, not merely possible. *Lujan*, 504 U.S. at 560; *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 526 (E.D.N.Y. 2013) (deeming an alleged economic injury "hypothetical" because the IRS had not yet made a determination as to the relevant trust's tax status,

9

and "plaintiff has not alleged that the trust has had any tax liability imposed on it"); *Scanlan v. Kodak Ret. Income Plan*, 678 F. Supp. 2d 110, 114 (W.D.N.Y. 2010) (finding the plaintiff's "threatened injury" of "potential tax consequences" was "neither concrete nor imminent, but relies upon an extended series of hypothetical events").

Plaintiffs allege that they are injured because if Cliffs, at some indefinite point in the future, were to enter bankruptcy, the amount Plaintiffs recovered in that potential future bankruptcy may turn out to be less than it would have been in an imaginary alternative bankruptcy in which the 1.5L Notes did not exist. Complaint ¶¶ 4, 6, 56-57. Put another way, Plaintiffs' alleged harm is that the Class Notes, being unsecured, would be effectively subordinated in a bankruptcy to the new 1.5L Notes to the extent of the value of the assets securing the new notes. Complaint ¶ 35. However, there is no allegation a bankruptcy is imminent. This precludes finding an injury-in-fact, because "[t]he Court cannot decide a case with a hypothetical injury that may never occur." *SC Note*, 934 F. Supp. 2d at 527.

10

In *Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d
79 (2d Cir. 2014), the Second Circuit concluded that the
plaintiff's alleged harms failed to meet the injury-in-fact test
where the plaintiff contended that, due to allegedly defective
mortgage assignments, he could have owed a different entity
money; some other entity could have foreclosed on him; and he
could have been prevented from selling his home because of a
cloud on his title. *Id.* at 85-86. Though possible, all these
injuries nonetheless were "conjectural or hypothetical," and the
plaintiff thus lacked Article III standing. *Id.* at 86; *see also*
*Springer v. U.S. Bank N.A.*, No. 15-cv-1107(JGK), 2015 WL
9462083, at *4 (S.D.N.Y. Dec. 23, 2015) (collecting mortgage
cases finding no Article III standing because injuries were
hypothetical). Similarly, ascertaining Plaintiffs' alleged harm
here would require a comparison of the assets Plaintiffs would
have received in a hypothetical future bankruptcy without the
Exchange Offer (where Plaintiffs would have shared pro rata with
nearly $400 million more in senior unsecured notes and would
have been junior to an additional $114 million in secured 2L
Notes) versus the amount Plaintiffs would receive in an
alternative hypothetical future bankruptcy (where Plaintiffs'
pro rata share of the senior unsecured notes is significantly
larger and Cliffs' overall debt load is smaller, but Plaintiffs

11

are junior to an additional $105 million in secured notes [the new 1.5L Notes less the exchanged 2L Notes]). *Id.*, Ex. G. Again, where the alleged harm "is [] entirely hypothetical," *Rajamin*, 757 F.3d at 85, no injury-in-fact exists.

There also is no injury-in-fact from Plaintiffs' inability to participate in the Exchange Offer, because they have not alleged they would have accepted the offer. Absent an allegation that Plaintiffs stand ready and willing to accept the Exchange Offer on the same terms as the QIBs who accepted it, there can be no injury-in-fact because Plaintiffs would be in the exact same position as that in which they currently stand. *Cf. Pesa v. Yoma Dev. Grp., Inc.*, 965 N.E.2d 228, 230 (N.Y. 2012) ("The rule requiring non-repudiating buyers to show their readiness, willingness and ability to perform is supported by common sense.").

Plaintiffs also allege two harms from the subordination of the Class Notes: (a) that the Class Notes "diminished in value as a result of the Exchange Offer;" and (b) that subordination is harm in and of itself. Pls. Br. 7, 8, 10. However, these allegations are belied by record facts; the Plaintiffs' bonds increased in value in the wake of the Exchange

12

Offer. On January 26, 2016, the day before the Exchange Offer was announced, the 5.9% Notes and the 6.25% Notes closed at $11.78 and $11.50, respectively. On February 29, the day Cliffs announced the results of the Exchange Offer, the 5.9% Notes closed at $14.60 and the 6.25% Notes at $13.30 - an increase of 24% and 16%, respectively, over their pre-Offer prices. More recently, on August 15, 2016, they closed at $88.50 and $68.30, respectively, for increases in value of roughly 500-650%. Where Plaintiffs point to no concrete harm that actually has occurred or is imminent, and, moreover, the challenged transaction produced an economic benefit, they have not suffered the kind of injury-in-fact that is a prerequisite to invoking the limited jurisdiction of an Article III court. *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004) (dismissing claims by bondholders for failure to satisfy Article III's injury-in-fact requirement because "[r]ather than alleging any losses on [the] bonds, the allegations of the Amended Complaint reveal that [the] bonds purchased by Lead Plaintiff have actually increased in value").

The Plaintiffs cite to *NECA-IBEW Health & Welfare Fund v. Goldman Sachs Co.*, 693 F.3d 145 (2d Cir. 2012), which is not instructive here because in *NECA-IBEW*, the plaintiff alleged a

55-65% drop in the market value of the securities, an allegation
that was sufficient to support finding a cognizable injury. *Id.*
at 155, 165-66. The Plaintiffs also cite to *Royal Park
Investments SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587
(S.D.N.Y. 2015), which held that continuing holders may pursue
TIA claims by showing diminution in value of notes they own,
rather than actual out-of-pocket losses. *Id.* at 612. Continuing
holders can, of course, have standing, but only if they allege
an injury-in-fact in the form of value diminution.

As to subordination-as-harm, Article III standing,
again, requires harm that is actual or imminent, not conjectural
or hypothetical. Subordination would matter only in a bankruptcy
context, and Plaintiffs concede they "have not alleged an
imminent filing of a voluntary bankruptcy petition." Pls. Br. 8,
n.3. The supposed "harm"—a potential lower payout in bankruptcy—
is a theoretical situation that may never come to pass; it is
neither actual nor imminent. The possibility that, at some
future time, Cliffs "will be unable to pay Plaintiffs' claims"
is "far too hypothetical, speculative, and uncertain to
constitute an 'imminently threatened injury' worthy of federal
intervention." *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp.

3d 424, 437 (S.D.N.Y. 2015) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009)). The Plaintiffs lack standing.

## IV. The Offer is Not Barred by the Indenture

Plaintiffs argue that the Offer is barred by the Trust Indenture Act ("TIA" or the "Act"). The TIA was enacted in 1939 "to address perceived abuses in the bond market." *Retirement Bd. of the Policemen's Annuity & Benefit Fund of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 163-64 (2d Cir. 2014); *see also* Mark Roe, *The Voting Prohibition in Bond Workouts*, 97 YALE L.J. 232, 250-69 (1987) (explaining the TIA's history and requirements). Section 316(b) of the TIA, at issue here, reads in relevant part:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder . . . .

15 U.S.C. § 77ppp(b). In short, the Section is "a statutory provision requiring that bond indentures protect minority bondholders by prohibiting majority bondholders from

15

collusively agreeing to modify the bond's payment terms." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010).

There are two lines of cases interpreting this provision. The difference between them is essentially whether "the [TIA-established] right . . . to receive payment of the principal [] and interest" provides a legal right to payment (the narrow cases) or a practical right to payment (the broad cases). 15 U.S.C. § 77ppp(b). Further, in cases interpreting the provision more broadly, courts differ on what it means for that right to "be impaired or affected." *Id.*

The narrow interpretation of Section 316(b) holds that a bond's core payment provisions, such as the repayment term, the interest rate, and the amount of principal, cannot be altered over a bondholder's objection. Actions that merely diminish the practical, *i.e.*, economic, likelihood of repayment do not violate the statute. Plaintiffs do not dispute that if the Court adopts the traditional view of the TIA, the TIA claim must be dismissed. Pls. Br. 13-14.

16

The broad cases hold that, in at least some circumstances, Section 316(b) protects the practical ability to receive principal and interest. Section 316(b) will be violated even without amending a core payment term, under these cases, by effecting an out-of-court quasi-bankruptcy reorganization. To date, the broad cases require at least: (1) a transfer of assets; or (2) removal or material modification of inter-corporate guarantees or security interests.

In *Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*, No. 99 CIV 10517 HB, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999), the Honorable Harold Baer preliminarily enjoined a transaction by which a company conducted a cash tender offer for its bonds paired with covenant-stripping exit consents, including a release of guarantees, and an avowed plan to transfer away 99.9% of the obligor's assets upon consummation of the tender offer, thus leaving holdouts with worthless paper. The planned divestiture of assets left "no meaningful recourse for plaintiffs or any noteholder who concludes this is a bad deal." *Id.* at *6. Addressing the Section 316(b) argument, Judge Baer held that the combination of the elimination of the inter-corporate guarantees and the simultaneous disposal of all assets

17

violated the statute, because the company had taken "steps to preclude any recovery by noteholders." *Id.* at *7.

In *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.,* 75 F. Supp. 3d 592 (S.D.N.Y. 2014) ["*Marblegate I*"], the defendant devised an exchange offer in which exchanging holders of unsecured but guaranteed notes would receive a package of debt and equity in a new company. Following the exchange, pre-existing secured lenders would (1) release a parent guarantee, which would trigger the release of a parent guarantee for the non-exchanging unsecured notes; (2) foreclose on the company's assets; and (3) immediately transfer those assets to the new post-exchange-offer company. The end result was that non-exchanging bondholders would be left holding debt stripped of its guarantees and issued by a company with no assets. *Id.* at 600–02.

Although the Honorable Katherine Failla denied a preliminary injunction, she concluded that the plaintiffs likely would prevail on the merits, holding that "[p]ractical and formal modifications of indentures that do not explicitly alter a core term 'impair[ ] or affect[ ]' a bondholder's right to receive payment in violation of the Trust Indenture Act only

18

when such modifications effect an involuntary debt restructuring." *Id.* at 614. She noted that this "standard" did not "prevent majority amendment of a significant range of indenture terms, including many that can be used to pressure bondholders into accepting exchange offers." *Id.* at 614-15. Where the transaction at issue, however, operates to "effect a *complete* impairment of dissenters' right to receive payment," it is of the type that the TIA "is designed to preclude." *Id.* at 615 (emphasis added). The "purpose of the Act," Judge Failla concluded after a bench trial, is to "not allow minority bondholders to be forced to relinquish claims outside of the formal mechanisms of debt restructuring." *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.*, 111 F. Supp. 3d 542, 556 (S.D.N.Y. 2015) ["*Marblegate II*"].

        The Honorable Schira Scheindlin has issued two post-*Marblegate* TIA opinions that are useful here. In the first case, *MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entm't Corp.*, 80 F. Supp. 3d 507 (S.D.N.Y. 2015), Caesars Entertainment Corporation ("CEC") began causing the transfer of assets out of its operating subsidiary that had issued the debt. In exchange for a premium, sufficient holders of the subsidiary's notes tendered into a linked tender offer/exit

consent to release CEC's parent guarantees and allow further transfers of the subsidiary's assets. The subsidiary later was placed into bankruptcy. The court refused to dismiss an action by the noteholders against CEC, concluding that the allegations that the "[t]ransaction stripped plaintiffs of the valuable CEC Guarantees leaving them with an empty right to assert a payment default from an insolvent issuer are sufficient to state a claim under Section 316(b)." *Id.* at 516. In *BOKF, N.A. v. Caesars Entm't Corp.*, 144 F. Supp. 3d 459 (S.D.N.Y. 2015), Judge Scheindlin addressed the standard for Section 316(b) claims and concluded that "in order to prove an impairment under section 316(b), plaintiffs must prove either an amendment to a core term of the debt instrument, or an out-of-court debt reorganization." *Id.* at 468. A debt reorganization can violate Section 316(b), she wrote, when it "leav[es] some noteholders with an unaltered formal right to payment, but no practical ability to receive payment." *Id.* at 473.

As these cases illustrate, Section 316(b) sprang from concerns about majorities abusing minority holders, which did not occur here. *See Marblegate I*, 75 F. Supp. 3d at 615 ("[W]here a debt reorganization that seeks to involuntarily disinherit the dissenting minority is brought about by a

20

majority vote, that violates the fundamental purpose of the Trust Indenture Act."); *see also BOKF*, 144 F. Supp. 3d at 473 ("[T]he legislative history makes clear the purpose of the right enunciated in section 316(b): to protect minority bondholders against debt reorganizations resulting from a majority vote, outside of judicial supervision."). There was no vote here, and no majority action of any kind. See Compl., Exs. E & G (only $219 million out of the potential $710 million in new notes issued, and none of the six bond classes exchanged more than 40%). There was no de facto bankruptcy reorganization executed outside the supervision of a bankruptcy court, as required by this set of cases.

In fact, none of the indicia of an involuntary, out-of-court pseudo-bankruptcy outlined in the instructive cases is present here. Plaintiffs were not "forced to relinquish claims" outside of bankruptcy-court protections, *Marblegate II*, 111 F. Supp. 3d at 556, nor were they left with "no practical ability to receive payment," *BOKF*, 144 F. Supp. 3d at 473. The Exchange Offer did not dispose of any assets. It did not amend any terms of the indentures. It did not modify or remove any guaranty. Nor are there any plausible allegations to that effect in the Complaint. In short, Plaintiffs were not left holding a

21

"worthless right to collect principal and interest."

*MeehanCombs*, 80 F. Supp. 3d at 509.

## V.   The State Law Claims Are Dismissed

Under New York law, the state-law claims fail because Plaintiffs have not complied with the Indentures' no-action clause, which required Plaintiffs, before suing "with respect to this Indenture," to (1) notify the trustee of a default; (2) marshal support of investors holding at least 25% of the interests in the Class Notes and request that the trustee sue; (3) offer the trustee indemnification for costs incurred in that lawsuit; and (4) wait 60 days, during which time the trustee evaluates the requested suit and holders of a majority of interests can stop the suit by providing "inconsistent" direction to the trustee. Base Indenture § 6.7.

The Plaintiffs have not alleged they complied with the no-action clause. Complaint ¶¶ 72-74. In seeking to avoid dismissal, Plaintiffs do not allege that the no-action clause is invalid or inapplicable to lawsuits like theirs. Instead, they assert compliance was excused for two reasons.

22

First, Plaintiffs argue that "it was impossible for Plaintiffs or any holders of the Class Notes to comply with the No-Action Clause before the Exchange Offer expired," because the Offer was scheduled to close a month after it was announced, and the no-action clause contains a 60-day period for the trustee to evaluate the requested suit. Complaint ¶ 72; Base Indenture § 6.7(d)-(e). An impossibility "excuse" is available only where compliance is actually impossible. For example, in *Whitebox Convertible Arbitrage Partners, L.P. v. World Airways, Inc.*, No. 1:04-CV-1350, 2006 WL 358270 (N.D. Ga. Feb. 15, 2006), the court excused compliance because "[t]he clause require[d] a bondholder to wait 60 days before filing suit," and "the Indenture was terminated, and the Trustee discharged, within the 60-day period required by the no-action clause." *Id.* at *4. No analogous circumstances exist here.

The Plaintiffs have not claimed that the relief they seek would be unavailable if they had followed the no-action clause. They seek damages and a declaration that the Exchange Offer was "invalid." Compl., Prayer for Relief. Even today, the trustee would be perfectly able to bring the very same claims Plaintiffs are asserting now. *See Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1297 (11th Cir. 2012)

23

(applying New York law and rejecting argument that, "because the trustee demand exception requires [holders] to wait sixty days after making a demand on the trustee and [defendant] announced its dividends less than sixty days in advance, Plaintiffs were estopped from complying with the no-action clause").

Second, Plaintiffs have alleged the trustee suffered a "debilitating conflict of interest preventing it from bringing claims with respect to the Exchange Offer." Complaint ¶ 73. "[W]hen the trustee, by reason of conflict of interest or unjustifiable unwillingness, cannot properly pursue a remedy for trust beneficiaries," *Akanthos*, 677 F.3d at 1294, a court may excuse compliance with the no-action clause; however, absent allegations of that misconduct by the trustee itself, non-compliance with the no-action clause is not excused. *SC Note*, 934 F. Supp. 2d at 532 (rejecting attempt to avoid no-action clause where complaint did "not implicate [the trustee] in any wrongdoing"); *see also Akanthos*, 677 F.3d at 1295 ("[W]e find the present case—involving no allegations of misdeeds by the Trustee—factually distinguishable from cases in which claims are brought against the trustee.").

24

Plaintiffs note that, because U.S. Bank is also the indenture trustee and collateral agent for the new 1.5L Notes and will receive (unspecified) "compensation" for those roles, it would not sue Cliffs. Complaint ¶ 73. But they "make no particularized allegations that [U.S. Bank would] financially benefit[] from its decision not to" sue Cliffs "or otherwise conspired with [Cliffs] to defraud the trusts, which are the classic hallmarks of a conflict of interest." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 187 (S.D.N.Y. 2011). Nor do they allege that any fees would be material to U.S. Bank such that it would be unable to function as trustee for the Class Notes. Plaintiffs allege no more than a relationship between issuer and trustee here. The law is clear that "[a] conflict of interest cannot be inferred solely from a relationship between an issuer and an indenture trustee that is mutually beneficial and increasingly lucrative." *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98-cv-6907, 2000 WL 877004, at *2 (S.D.N.Y. June 30, 2000); *see also CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 475 (S.D.N.Y. 2010) (no "actual conflict of interest" where U.S. Bank was trustee on other bond deals absent evidence that revenues from those deals, "which are infinitesimal in

25

comparison with the overall revenues of these financial
institutions," affected U.S. Bank's actions).

Finally, even if Plaintiffs had plausibly alleged an
excuse for ignoring the no-action clause's demand requirement,
that would not justify their failure to comply with the 25%
requirement. *See Cedarwoods CRE CDO II, Ltd. v. Galante
Holdings, Inc.*, 948 N.Y.S.2d 17, 18 (App. Div. 2012) (affirming
dismissal for "fail[ure] to comply with the . . . 'no-action'
clause" where "Plaintiffs only h[e]ld an interest in two of the
affected classes [of certificates] constituting far less than
the required 25%"). Plaintiffs suggest that the 25% requirement
should be ignored because this is a putative class action, Pls.
Br. 19, however, courts have dismissed would-be class claims for
failing to satisfy that threshold. *See, e.g., Friedman v.
Chesapeake & Ohio Ry. Co.*, 395 F.2d 663, 664 (2d Cir. 1968)
(affirming dismissal of class action filed by 1% holder for
failing to comply with 25% requirement); *Alleco, Inc. v. IBJ
Schroder Bank & Trust Co.*, 745 F. Supp. 1467, 1476 (D. Minn.
1989) (dismissing claims by 19% holder for failing to comply
with 25% requirement).

26

The Plaintiffs contend that Section 6.8 of the Base Indenture allows "a lawsuit to enforce their absolute and unconditional right to receive payment of principal and interest" and that *MeehanCombs* rejected any limit on this exception to the no-action clause. Pls. Br. 17-18. However, in *Emmet & Co. v. Catholic Health East*, 951 N.Y.S.2d 846 (Sup. Ct. 2012), *aff'd*, 114 A.D.3d 605 (1st Dep't 2014), New York courts interpreted language like Section 6.8 and held it did not excuse complying with a no-action clause, except in "suits for past due, accrued interest," because "allowing lawsuits for unaccrued payment obligations would essentially allow all claims relating to the value of the bond, and would let the payment exception swallow the no-action clause." *Id.* at 859-60.

## VI.   **The Breach of Contract Claim Fails**

The alleged breach of contract is the violation of Section 6.8 of the Base Indenture, which reads:

> Notwithstanding any other provision in this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any, on such Security on the Stated Maturity or Stated Maturities expressed in such Security (or, in the case of redemption, on the redemption date) and to institute suit for the enforcement of any such payment, and such rights

27

>           shall not be impaired without the consent of such
>           Holder.

15 U.S.C. § 77rrr(c). This mimics Section 316(b) of the

TIA, and Section 318(c) of the TIA mandates that a Section

316(b) provision be included in all qualified indentures.

Because Section 318(c) of the TIA essentially requires the

inclusion of Section 6.8, the analysis as to whether this

provision has been breached is the same as the TIA analysis

above. Only the "absolute and unconditional" language is

additional, providing the sole possible basis for finding

the provision breached if Section 316(b) itself was not.

However, as noted in the ABF's influential Commentaries—

which includes a nearly identical model provision—the

"purpose of such provisions [which became common in the

late 1920s] was to assure the negotiability of the

debentures by making certain that the promise to pay

contained therein was unconditional." ABF, *Commentaries on

Indentures* 234.


        A number of New York cases have analyzed the

"absolute and unconditional" language, including in TIA

cases, and concluded that such a clause "overrides [a]

conflicting limited recourse provision," *First Millennium*,

607 F.3d at 917–18; affects whether a guarantee is of

28

payment rather than collection, *MeehanCombs*, 80 F. Supp. 3d at 519-20; and prevents contract counterparties from raising affirmative defenses, such as fraudulent inducement, that would conflict with the unconditional promise to pay, *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974, 977 (N.Y. 1985). These types of clauses affect the remedies and defenses available in a subsequent collection action but do not change the analysis as to whether the "right to . . . receive payment" was violated in the first instance. *Cf.* UPIC, 793 F. Supp. at 460 (construing a subordination provision as consistent with Section 316(b) and an indenture clause with "absolute and unconditional" language).

Accordingly, the breach of contract claims under Section 6.8 are dismissed under the same reasoning as the TIA claims are dismissed.

## VII.   The Implied Covenant Claim Is Dismissed

Although Plaintiffs can point to no term of the contract that was breached by the Exchange Offer, that transaction purportedly "deprived Plaintiffs of the benefit

29

of their bargain under the Indentures." Complaint ¶ 100.
This claim invokes the covenant of good faith and fair
dealing, which "is implied in every contract" and prevents
parties from taking actions that "have the effect of
destroying or injuring the right of the other party to
receive the fruits of the contract." *Emmet & Co., Inc. v.
Catholic Health E.*, 16 N.Y.S. 3d 154, 167 (Sup. Ct. 2015).
"The implied covenant" is a limited, gap-filling cause of
action; it "will only aid and further the explicit terms of
the agreement." *In re Solutia, Inc.*, Adv. No. 05-01843,
2007 WL 1302609, at *10 (Bankr. S.D.N.Y. May 1, 2007). It
does not permit a "court to create contract terms that the
parties have not negotiated for." *Id.*

Accordingly, "[i]f the challenged transaction
does not violate any express term of the indenture, or
prevent the bondholder from obtaining the benefit of an
express indenture term, a bondholder may not challenge an
action by the corporation on the basis of breach of the
indenture contracts." *Geren v. Quantum Chem. Corp.*, 832 F.
Supp. 728, 733 (S.D.N.Y. 1993). In dealing with a company's
bondholders, that which is not prohibited is permitted.
"Indentures are to be read strictly and to the extent they

30

do not expressly restrict the rights of the issuer, the issuer is left with the freedom to act, subject only to the boundaries of other positive law." *In re Loral Space & Commc'ns Inc.*, Nos. 2808-VCS & 3022-VCS, 2008 WL 4293781, at *35 (Del. Ch. Sept. 19, 2008) (applying New York law).

Plaintiffs cannot identify any express provision of the Indentures that was breached or the benefit of which they purportedly were denied. Instead, they posit that the Court should look to provisions concerning a "change in control" or partial redemptions, and allege from a new contractual term that, had it existed, the Exchange Offer would have breached. Complaint ¶¶ 8, 66-68, 98. However, "courts have declined to find that the implied covenant of good faith and fair dealing adds to the contract a substantive provision not included by the parties." *Geren*, 832 F. Supp. at 732.

Plaintiffs contend the Exchange Offer violated the implied covenant because non-QIBs could not participate. They point to other provisions in the Indentures mandating equal treatment in other situations, ¶¶ 8, 68-69, 98, and then claim that a different type of activity—an exchange offer— also should

31

be covered. However, the existence of other provisions establish
that: (1) the potential for non-pro-rata treatment was foreseen
from the outset; and (2) bondholders are able to negotiate for
protective covenants for those scenarios in which they find it
beneficial. *See Loral Space*, 2008 WL 4293781, at *35 (concluding
there is no established norm of equal treatment in a case
applying New York law). Indeed, when the Indentures were
negotiated, QIB-only exchange offers had occurred. In *Bank of
N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113 (Del. Ch. 2008), the
court applied New York law and passed over the QIB-only feature
of the exchange offer without criticism. *Id.* at 1117 & n. 3. The
court halted the transaction only because it would create new
liens explicitly forbidden by specific covenants. *Id.* at 1128.
*Realogy* was on the books for investor consumption at the time
the Indentures for the Class Notes was prepared. Additionally,
non-pro-rata treatment of bondholders had been the focus of an
empirical analysis of protective covenants in 1990s; the concept
of disparate treatment of bondholders is not new.

Cases to which Plaintiffs cite involve express clauses
requiring equal treatment. *See Argentinian Recovery Co. LLC v.
Board of Directors of Multicanal S.A.*, 331 B.R. 537, 543
(S.D.N.Y. 2005); *Whitebox Convertible Arbitrage Partners, L.P.*

32

*v. World Airways, Inc.*, No. 04-cv-1350, 2006 WL 358270, at *2
(N.D. Ga. Feb. 15, 2006). This further emphasizes that the
Indentures here could have included a provision barring
differential treatment of bondholders in exchange offers, but it
did not. The Cliffs Indentures "could easily have been drafted
to incorporate expressly the terms the Plaintiffs now urge this
court to imply." *Hartford Fire Ins. Co. v. Federated Dep't
Stores, Inc.*, 723 F. Supp. 976, 992 (S.D.N.Y. 1989). They were
not; that is the end of the claim.

## VIII. The Unjust Enrichment Claim Is Dismissed

Count Four merely duplicates the contract claim.
Complaint ¶¶ 91, 105. New York law makes clear that "unjust
enrichment is not a catchall cause of action to be used when
others fail. It is available only in unusual situations . . . .
Typical cases are those in which the defendant, though guilty of
no wrongdoing, has received money to which he or she is not
entitled." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185
(N.Y. 2012). "An unjust enrichment claim is not available where
it simply duplicates, or replaces, a conventional contract or
tort claim." *Id.*

33

Plaintiffs' authority shows only that "where there is a bona fide dispute as to the existence of a contract or the application of a contract to the dispute in issue, . . . the plaintiff may properly plead unjust enrichment . . . as [an] alternative claim[ ] to the breach of contract claim." *Goldman v. Simon Prop. Grp., Inc.*, 869 N.Y.S.2d 125, 135 (App. Div. 2008). Here, the existence of a contract and its application to the dispute is not at issue. Further, Plaintiffs do not plead unjust enrichment in the alternative, instead tying the claim explicitly to the contract claim: "benefits were obtained by intentional[] violat[ion] . . . [of] contractual rights." Complaint ¶ 106. Unjust enrichment thus is not available as a cause of action.

## IX. The Declaratory Judgment Claim Is Dismissed

Count Five mimics Counts One and Two. The Complaint recognizes this, as Counts One and Two identically seek "the declaratory relief sought in Count Five." Complaint ¶¶ 87, 93. Plaintiffs assert that these claims "are not 'so similar.'" Pls. Br. 25. But Count Five seeks an interpretation of rights "[u]nder the TIA," Complaint ¶ 109 (an issue covered by Count One), and "the Class's rights under the Indentures," Complaint ¶

34

110 (an issue covered by Count Two). When only past acts are involved and there is a backward-looking remedy—damages for breach of the TIA—there is no occasion or basis for a separate declaratory remedy. *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012). Nothing in the opposition brief rescues the declaratory judgment claim from dismissal. Where a declaratory judgment claim is duplicative, resolving it "would serve no 'useful purpose'" and dismissal is appropriate. *Id.* As Counts One and Two are dismissed, nothing is left of Count Five.

## X. Conclusion

Based on the conclusions set forth above, the motion of the Defendant is granted and the Complaint is dismissed. Leave to replead within 20 days is granted.

It is so ordered.

**New York, NY**
**December 6, 2016**

ROBERT W. SWEET
U.S.D.J.